Argued December 21, 1911, decided January 23, 1912.

## CITY OF NEWBERG *v.* KIENLE.

[120 Pac. 3.]

HIGHWAYS—ESTABLISHMENT BY USER—PRESUMPTION AS TO EXTENT OF USE.

1. Where the owner of land abutting on a road laid out by the county builds a fence on the line claimed by him, the public use of the road will be presumed to extend to the fence.

MUNICIPAL CORPORATIONS—STREETS—ESTABLISHMENT BY USER — EVIDENCE OF LOCATION.

2. Evidence in an action to enjoin an abutting owner from extending a building into a city street *held* sufficient to show that certain trees indicated the line of a fence built by the predecessors of the abutting owner and which served for more than twenty-four years as a boundary of a public road.

MUNICIPAL CORPORATIONS — OBSTRUCTION OF STREET — ACTION FOR INJUNCTION—ESTOPPEL.

3. In an action by a city to enjoin defendant, an abutting owner, from extending a building in the course of erection beyond the line of the street where defendants had not occupied the property beyond the line or been induced by the city to do any act or make any expenditure upon the

grounds outside of such line, and where defendant had sufficient knowledge to put him on inquiry as to the city's right, there was no estoppel against the city.

From Yamhill: WILLIAM GALLOWAY, Judge.

This is an injunction proceeding by the City of Newberg against Edward J. Kienle. From a judgment in favor of defendant, plaintiff appeals.        REVERSED.

For appellant there was a brief over the names of *Mr. S. B. Huston* and *Mr. Clarence Butt*, with an oral argument by *Mr. Huston*.

For respondent there was a brief over the names of *Messrs. McCain & Vinton* and *Mr. F. W. Fenton*, with oral arguments by *Mr. McCain* and *Mr. Vinton*.

Opinion by MR. CHIEF JUSTICE EAKIN.

The City of Newberg by this proceeding seeks to enjoin defendant from extending into the street a building he is erecting on block 12 of Everests' addition to Newberg, and the dispute is as to the location of the northwest line of the street now called "Dayton Avenue," formerly known as the "Dayton-Portland road," which we will hereafter refer to as the road. It was traveled as a road long prior to 1866, passing approximately north 47 degrees 10 minutes east, diagonally across the northwest corner of the Rogers donation land claim, which is now within the city of Newberg. In March, 1866, David Everest purchased from the heirs of Rogers 17 acres in the northwest corner of the claim, including that part of the claim northwest of the road. Until purchased by Everest, and for a few years thereafter, this portion of the Rogers donation claim evidently was not inclosed. Richard Everest, a son of David Everest, says that about three years after his father traded for the 17-acre tract he fenced it, namely about the year 1871, which, so far as appears, was the only fence ever built along the northwest side of the road and inclosed the Everest tract, and

which remained there until about the year 1895, when it began to disappear. On March 1, 1888, Everest platted the tract into lots, blocks, streets, and alleys. The notes of the survey of the platting, if any, are not in evidence, and there is nothing on the plat to indicate the location of the southwest line of the platted ground. All the blocks bordering on the road are fractional blocks, and their dimensions cannot be determined from the plat, but the southeast lines of the blocks are indicated thereon by heavy black lines adjacent to the road. The tracing of the survey of the 17-acre tract, given in evidence by Herring, as taken from the deed, discloses that it included a portion of the road as now recognized, namely, about 15 feet. If the blocks and lots were staked on the ground when the addition was platted, it was not shown in the evidence nor has there been any attempt to locate the corners or lines of the blocks bordering on the road. If Everest owned to the center of the road at the time he platted the ground, we would be justified from the facts appearing in holding that he dedicated to the public so much of the road as is included in his tract, but, as we have before us no data as to these facts or the location of the road with reference to the plat, it does not aid us in determining the location of the road or rather its northwest boundary.

1. It appears that the county made some effort in April, 1871, to lay out and establish the road as a county road under the statute, but it is practically conceded that what was done in that matter was insufficient to establish a road, and the record does not aid plaintiff's case other than it operates as color of title in the use of the road thereafter. It is to be noted that the building of the fence was approximately at the time of this attempt by the county to lay out the road, and the use by the public will be presumed to extend to the fence.

It is said in *Washington Borough* v. *Steiner,* 25 Pa. Super. Ct. 392, that:

"Where the right to a public highway is acquired by adverse user, an important element in determining the width thereof is the recognition of the limits of the way by the owners whose lands front thereon, as indicated by the monuments and fences which they themselves place upon the ground, and the lines which they fix for the same in making conveyances of their property."

In *Kruger* v. *Le Blanc,* 70 Mich. 79 (37 N. W. 882), it is said:

"Highways by user are based upon the implied dedication by the owner of the land; and, where there is nothing to indicate a contrary intention, the presumption is that the owner intended to dedicate the land to the full legal width. *Bumpus* v. *Miller,* 4 Mich. 159. But where the owner has placed fences or other means, during the time the statute is running, within the statutory width, it indicates an intention not to dedicate to the full width, and the public is only entitled to claim the part which it has been permitted to use."

It is conceded by defendant that this road was a legal county road, and is now a city street by user, and he only questions its location or the location of its northwest boundary. These statements eliminate all the questions involved, except the location of the boundary of the road as acquired by user. Adverse possession of the ground cannot aid defendant, unless his possession continued for 10 years prior to the 25th day of May, 1895, when the State and county were exempted from the operation of the statute of limitations, and defendant makes no contention of such possession except by virtue of the original fence built in 1871 by Everest, and plaintiff seems to admit that the location of that fence is the northwest boundary of the road, and is the true boundary of the road, and we will attempt to ascertain the original

location of the fence, referred to as a "rail worm fence."
At the time of the trial there was none of the fence
remaining, and plaintiff seeks to establish its original
location by persons who were familar with it.   Many
witnesses identify an apple tree as having stood within
the worm of the fence on the ground that is now a part of
defendant's lot, the stump of which is now intact and
within defendant's building.   A great deal of the testi-
mony for both parties centered around this tree.   They
also identify a haw tree, which is still standing on block
12 and near defendant's lot, farther southwest, as having
stood in the fence line.   There are many other trees that
are identified as either having stood in the fence line or
very near it, most of them still farther southwest, which
are all very persuasive as to the location of the fence.
The apple tree mentioned is the most important, as it is
within defendant's lot, and, if identified, determines the
line at the immediate point in controversy.

Wilson's testimony is to the effect that he lived there
about 21 years and used to get upon the fence and pick
apples from that tree; that it was very close to the worm
of the fence.   He also identifies the other trees and briars,
and other indications on the ground, of the fence line.

Jesse Edwards, who has been there 29 years, testified
as to a haw tree that indicates distinctly where the fence
was, its limbs having spread between the rails; that the
apple tree stood in the corner of the fence, and the rose
briars along the fence all indicated the fence row.

Hoskins, who lived there since 1879, says:

There was a fir tree stood well up to where that road
junctioned with the Portland road, up close to the corner
(the northwest corner of block 12), * * farther down,
* * probably six rods there was an apple tree; and still
farther down, but a little east or a little west, was another
apple tree, but before you get to that apple tree there was
a  haw  bush  or  thorn,  crab-tree,  or  something  stood
between the apple trees. * * The  lower  apple  tree  was

inside of the field.   * * The fir tree * * and the first apple tree was very nearly the corner of the lock of the fence.   * * The thorn tree was out in the field a little."

And except the one apple tree they were in the line of the fence.

Oliver, Butler, C. J. Edwards, Vestal, Hagey, and Smith all testify more or less definitely as to the briars, the thorn tree, apple trees, and the fir, as indicating the line of the fence.   The testimony of W. R. Everest and Granville Everest, sons of David Everest, tends to contradict the location of the apple tree, the stump of which is still standing within defendant's building.   It had been many years since they moved away from their father's place and they have not noticed the trees much since, and evidently identified the tree that the other witnesses say was out from the fence a little way as the one evidenced by the stump.   The other witnesses state that the tree in the fence row bore yellow apples, while the Everests say that the tree they have in mind bore striped apples, and their testimony is not convincing.   The evidence tends to show that there were three apple trees, two in or near the fence and one lower and out from the fence a little, and the Everests must have had in mind the one out from the fence.

2. And we conclude that these trees, especially the haw tree and apple tree stump, indicate the line of the fence which was built in 1871, and stood there until probably 1895 or later, a period of more than 24 years, and has served as a barrier or boundary of the road on the northwest as traveled and used by the public.

We have before us, also, the county surveyor's field notes of the road filed in the road proceedings in 1871, and it is conceded that the portion of the survey between angles 20 and 21 is the portion of the road involved here, and in those notes the course is given "N. 46½ degrees E."

Witness Herring, who gives us his tracings of the

Everest tract, runs that line on the course north 47 degrees, 20 minutes east, being 50 minutes east of the county surveyor's course. This also tends to corroborate plaintiff's contention as to the location of the fence at block 12. This is further corroborated by the location of a blacksmith shop built at the present site of the new building. Smith testified that this new building is longer than the old shop.

"This building is a great deal longer (it extends farther south), * * especially the east part of it extends a great many feet * * farther back than the other part. The east part of the old building was short."

Furguson gives the dimensions of the old shop on the west side as 9 feet 2 inches shorter north and south than the new building, and 10 feet 6 inches shorter on the east side, indicating that it was wholly inside the line of the old fence; and it was built when the location of the fence could not have been in doubt, thus indicating that defendant's acts in extending the new building were the first encroachments at that point beyond the line of the fence. Everest and his successors in interest are bound by the location of the fence as indicating the northwest boundary of the road.

3. Defendant pleads estoppel against the city, but the estoppel alleged is that plaintiff has recognized the fence for more than 10 years as the northwest line of the road, but, as we have found that the fence was the northwest boundary of the road, we need not enter into any discussion of the estoppel. Neither defendant nor his predecessosrs have occupied the lot beyond the fence line as here found nor been induced by any acts of the city to do any act or make any expenditure upon the ground beyond the fence line.

The deed from Everest to Force, a prior owner of defendant's lot, does not give the exact dimensions of the lot conveyed, but conveys to the center of the road "sub-

ject to all road claims." Defendant knew that there was a question as to the location of the street line; talked about it with the chairman of the street commission before he had done more than lay the foundation of the building. He had sufficient knowledge to put him on inquiry, and what he did thereafter he did at his peril. He admits that he left the construction of the back end of the building to the last and put in an extra force of workmen to rush the work before he could be stopped, and he cannot now be heard to complain. And we conclude that the apple tree stump, now within a part of defendant's building, and the haw tree southwest of it and on block 12, indicate approximately the line of the fence as originally built and determines the northwest boundary of the road adjacent to block 12; that is to say, that the two trees mentioned indicate the inside line of the fence worm referred to in the evidence as a four-foot worm, while the outside line of the worm must be the boundary of the road.

Judgment of the lower court is reversed.     REVERSED.